OPINION
{¶ 1} Rick Saintgnue appeals from the judgment of the Montgomery County Juvenile Court wherein the court granted permanent custody of nine year old C.S. to the Montgomery County Childrens Services Agency (MCCS).
 {¶ 2} This matter began when C.S.'s maternal grandfather, James Pridgen, filed a dependency complaint alleging that C.S. appeared to be dependent because his mother, Christine Michaels, repeatedly failed to send him to school and because she was drug addicted and unable to care for C.S. Pridgen requested that legal custody be granted to his son and his wife.
 {¶ 3} Pridgen was granted interim custody and a guardian ad litem was appointed to represent C.S. Christine Michaels moved to dismiss the complaint and she informed the court that Rick Saintgnue was C.S.'s biological father. Ms. Michael's counsel informed the court of Saintgnue's address in Dayton.
 {¶ 4} Rick Saintgnue was served with the complaint and a notice of the hearing before the magistrate. On April 11, 2001, the magistrate recommended that C.S. remain in the home of his grandfather. The magistrate noted that appellant and the mother were present at the hearing with counsel. The court noted that C.S.'s mother stipulated to a finding of dependency and that all parties agreed that she would retain legal custody of C.S. and protective supervision would be granted to MCCS. The mother indicated she understood the case plan objectives. The magistrate noted appellant had been ordered to pay child support although he had not been determined to be the father of C.S. Appellant was served with a copy of the court's order adopting the magistrate's recommendations.
 {¶ 5} In August 2002, MCCS sought temporary custody of C.S. because his mother failed to complete her case plan and C.S. had been truant from school for over a year. The child's whereabouts were unknown for a year until he was found living with appellant in deplorable living conditions. The prosecuting attorney certified she had served all of the parties including appellant with a copy of the agency's motion at their last known address. On February 5, 2003, the court granted temporary custody of C.S. to MCCS.
 {¶ 6} On January 29, 2003, MCCS filed a motion for permanent custody of the child. A pretrial hearing was scheduled for April 1, 2003. C.S.'s mother was served through publication and appellant was served through publication after certified mail was returned "unclaimed" and regular mail did not come back. The Dayton Court Reporter announced to the unknown legal/biological father of the child notice of the permanent custody hearing to be held on April 1, 2003 regarding the child, C.S., born to Christine Michaels on June 15, 1993.
 {¶ 7} On April 1, 2003, a pretrial hearing was held on MCCS's permanent custody motion. On April 7, 2003, a pretrial order was filed by the court scheduling a permanent custody trial on July 14, 2003 and appointing all parties attorneys. On the motion, appellant was listed as the legal father and served at his last known address of 2879 College Hill Court, Beavercreek, Ohio 45431.
 {¶ 8} On June 18, 2003, the court appointed Patricia Rousseau of the Public Defender's Office to represent appellant in these proceedings. On June 26, 2003, MCCS filed a motion for a name change of the child as it was misspelled on the pleadings. The birth certificate attached to said motion was signed by Rick Lee Saintgnue as the father of the child.
 {¶ 9} On July 14, 2003, the court conducted a permanent custody hearing. Neither parent was present. Appellant's attorney represented that she did have contact with him and indicated that, "He has no objection. It isn't that he wouldn't like to have something to do with his son, but he feels he can't provide for him. If there is a family who can, that would be in the child's best interests." It was also undisputed at the hearing that appellant failed to ever establish paternity. At the hearing, the guardian ad litem, Jeffrey Rezabek, recommended a disposition of a planned permanent living arrangement (PPLA) and represented that the child would like to maintain contact with his step-sister and his mother. On September 9, 2003, the court granted permanent custody to MCCS.
 {¶ 10} On September 23, 2003, the guardian ad litem requested that the court appoint an attorney to represent C.S. On September 25, 2003, the court appointed James Armstrong to represent him. On September 23, 2003, November 24, 2003, and December 19, 2003, appellant objected to the Magistrate's Decision. The child's guardian ad litem and the child's attorney both objected to the Magistrate's Decision. On October 1, 2003 and December 31, 2003, MCCS responded to Appellant's objections. On January 14, 2004, the court affirmed the Magistrate's Decision and entered its "Decision and Judgment concerning the objections to the Magistrate's Decision."
 {¶ 11} The court explained in detail its decision to adopt the magistrate's recommendation that permanent custody of C.S. be placed with Montgomery County Children's Services.
 {¶ 12} "On September 9, 2003, Magistrate Harshbarger filed a Decision that found that the services provided by MCCS did not prevent the removal of the child from the child's home or enable the child to return home because the mother has significant substance abuse problems that have not been addressed, and the alleged father has failed to establish paternity. The child has been in foster care since July 8, 2002, and there were no relatives or non-relatives willing, able or suitable to assume custody of the child. The Magistrate further found that reunification of the child with the mother or alleged biological father was not possible in a reasonable period of time because the mother and father had failed to visit with the child, make contact with the caseworker or take advantage of the referrals made to aid them in completing their case plans. The Magistrate found that placement of the child with the mother or father would be a threat to the child's safety, as they have been unwilling to provide food, clothing, shelter, or other basic needs; have failed to visit or communicate with the child; have failed to regularly support the child financially; and have abandoned the child. Thus, the Magistrate found it to be in the best interests of the child to grant permanent custody to MCCS and strongly encouraged the foster parent to continue allowing contact with the child's sibling should she adopt the child.
 {¶ 13} "The minor child objects to the Decision of the Magistrate claiming that there was not clear and convincing evidence that it was in his best interest to be placed into the permanent custody of MCCS. He asserts, that the GAL, Jeffrey Rezabek, has been involved in the child's case for several years and feels that it is in said child's best interest for a PPLA to have been granted due to his significant bond with his mother, sister and aunt. He also claims that it was error for the Magistrate to find that he is orphaned and to find that the mother has placed the child at substantial risk of harm due to drug/alcohol use, as there was no evidence of these facts. The minor child claims that MCCS did not make reasonable efforts to make it possible for the child to return home, so the minor child should be placed in a PPLA.
 {¶ 14} "Rick Saintgnue objects to the Decision of the Magistrate claiming that there was not clear and convincing evidence that said child should be placed into permanent custody of MCCS, and MCCS did not make reasonable efforts to aid the parents in achieving the goals on their case plans. Mr. Saintgnue claims that the GAL recommended PPLA, as the child is bonded with his mother, sister, and aunt and has expressed a desire to maintain contact with these relatives. He also claims that said child informed the Magistrate that he did not wish to be adopted. Mr. Saintgnue asserts that he did not fully appreciate what permanent custody meant at the time of the trial, and he is able to provide a home for his son.
 {¶ 15} "MCCS responds claiming that clear and convincing evidence was presented to support that it was in the best interest of said child to be placed in the permanent custody of MCCS and that MCCS provided reasonable services to the parents. MCCS claims that although the GAL recommended PPLA, it was not without reservation, as the GAL stated that he had changed his mind several times, including the morning of the hearing and stated that permanent custody was not a bad solution. MCCS claims that they have provided a stable environment for the child and has enabled him to be a kid. MCCS also claims that the foster mother testified that she would continue to encourage said child to communicate with his biological family members and has shown in the past through her efforts to allow him to see his relatives. MCCS claims that although the child's wishes are important, they do not outweigh the need for this child to be in a safe, stable placement, and [C.S.'s] wish not to be adopted in the case that he could return to his mother if she `got clean of drugs' is insufficient to find that permanent custody is not in his best interests. Further, MCCS asserts that they did make reasonable efforts to reunify the child with his parents, but they are not a detective agency and should not be asked to search for parents who refuse to maintain contact with the agency or with their child, as extraordinary efforts are not required. The Agency claims that neither parent completed their case plans or even indicated that they were willing to work on their case plans, and neither parent made contact with the GAL. The Agency claims that PPLA is not statutorily appropriate and a legally secure placement cannot be achieved without granting permanent custody to MCCS. Finally, MCCS claims that the father's failure to appreciate the gravity of permanent custody is not grounds to overturn the permanent custody decision, as father was represented by competent counsel at trial.
 {¶ 16} "Upon a careful review of the record and the foregoing objections, the Court hereby OVERRULES the objections. The Court finds that it is in the best interests of the child that permanent custody be granted to MCCS. Clear and convincing evidence has been presented that the child is dependent and has been in foster care for more than 12 out of the last 22 months in foster care [sic], as the child has been in his current foster placement since July 8, 2002. (Tr. 8) Reasonable efforts were made to prevent the child's removal from the home and attempt to reunify the child with his parents in a reasonable time. The parents have not even attempted to complete their case plans and have not communicated or visited with the child in over a year, so the child will not be able to return to either parent within a reasonable time as set out in O.R.C. 2151.414.
 {¶ 17} "The Agency made reasonable efforts to attempt to reunify the child with the parents. As for the mother, Christine Michaels, the caseworker attempted to make contact with her on June 23, 2003 at Grandview Hospital, where she kicked her out of the room refusing to talk with her. (Tr. 9) Prior to that, the caseworker hadn't had contact with the mother or father since October 2002, as both parents failed to make contact with the caseworker and with their child. (Tr. 10) During that time in October, the caseworker discussed the case plan with the mother and discussed setting up visitation, which the mother never followed through with. (Tr. 10) The caseworker sent letters to the address that the mother had provided and made several telephone calls to that residence, but never received any returned letters and was unable to speak with her each time she called. (Tr. 12) The mother even gave the caseworker a cell phone number, and the caseworker found the number not to be in service when she tried calling it that same day. (Tr. 20) The Agency made referrals to the mother as to the DMHA housing list in order to aid her in completing her case plan objective of maintaining a stable residence and payment of her rent and utilities, which she had previously been evicted for. (Tr. 14) Additionally, the caseworker made two crisis care referrals for the mother, which she failed to follow through with. (Tr. 15) The Agency referred the mother to Family Services Association in order to meet her objective of individual counseling, but the mother again failed to attend. (Tr. 16)
 {¶ 18} "As for the father, Mr. Saintgnue failed to fill out the information necessary to refer him to establish paternity so the Agency was not able to aid his completion of this objective due to his own lack of cooperation. (Tr. 18) The Agency could not aid Mr. Saintgnue in his second case plan objective, because all he had to do was provide financial support to the child. (Tr. 18) Even after Mr. Saintgnue told the Agency that he was not willing to work on a case plan, the caseworker continued to send correspondence on a regular basis, despite the lack of any response by the father. (Tr. 19) Overall, the Agency provided case management information referral, substitute care for the child, and clothing assistance, which is hardly a de minimus effort, as was asserted by the father, as the Agency is only required to make reasonable efforts. (Tr. 19)
 {¶ 19} "The child had no stability while living with the mother, as she moved the child around a lot and failed to enroll the child properly in school, and this truancy was the reason why the original complaint was filed by the maternal grandfather on December 4, 2000. (Tr. 11) The mother has failed to show that any stability can be provided as it was reported at the hearing that she is currently residing in a motel. (Tr. 13) The mother failed to have a drug assessment due to her long history of drug abuse and recent hospitalization where the caseworker reported seeing track marks covering her arms. (Tr. 9) The mother failed to attend any individual counseling sessions to deal with her own past abuse issues which affect her parenting skills, despite referrals by the Agency. (Tr. 16) Overall, the mother has made no progress on her case plan. (Tr. 17) Mr. Saintgnue failed to establish paternity, which was one of his only two case plan objectives. (Tr. 7, 18) He also failed to provide support for the child, which was his second objective in order to show that he could demonstrate that he could provide for the child's basic needs. (Tr. 18) The father even told the caseworker that he was not willing to work on his case plan, and subsequently failed to make any progress whatsoever on his case plan objectives. (Tr. 19) Visitation was set up for both parents and neither one visited for over a year. (Tr. 21) Overall, the Agency does not believe that either parent will be ready for reunification in the foreseeable future. (Tr. 27)
 {¶ 20} "Further, a maternal aunt has legal custody of Ms. Michaels' other child Stephanie. [C.S.] has a significant bond with his sister, and his current foster parent has encouraged the child to stay in contact with her and other family members, which was adequately demonstrated by taking the child to Florida in order to visit with his family members. (Tr. 28, 33) The foster mother even testified that if she was to adopt the child, she would be willing to allow him to visit with his relatives. (Tr. 33) No other relatives or non-relatives are willing and able to assume custody of the child. (Tr. 22) [C.S.] is doing well in his current foster home, as his foster parent has gotten him involved in school activities and has taken care of his medical concerns, and she is willing to adopt. (Tr. 25-26)
 {¶ 21} "The Court finds that PPLA is not a statutorily viable option in this case. Ohio Revised Code § 2151.353(5) defines when a child may be placed in a Permanent Planned Living Arrangement. First, PPLA must be in the best interests of the child. Second, the child must fit into one of the categories set out in the statute. The child does not fit into O.R.C. § 2151.353(5)(a) because there was no evidence presented that the child is unable to function in a family-like setting due to any physical, mental or psychological needs. The child is only 10 years old, so he does not fit into O.R.C. § 2151.353(5)(c), as that section requires the child to be at least sixteen years or older. Counsel for the child and counsel for the father have argued that the child fits into O.R.C. § 2151.353(5)(b), but this Court does not agree. There was no evidence presented at the hearing that either parent has significant physical, mental or psychological problems, which make them unable to care for the child. Further, there is insufficient evidence that adoption is not in the best interest of the child, as a great degree of evidence was presented to the contrary, despite any requests made by the child. The only part of O.R.C. § 2151.353(5)(b) that the child fits into is that he still retains a significant and positive relationship with a parent or relative. The Court does note that the child does have a strong bond with his sister. (Tr. 29) The fact that the child fits into one part of a three-part test set forth in the statute is not sufficient to grant a PPLA, and the Court finds that it is not in the best interests of the child.
 {¶ 22} "Even though the Guardian Ad Litem ultimately recommended PPLA, he did state at the hearing that he went back and forth with his recommendation between PPLA and permanent custody, but did state that his current placement is very positive and permanent custody is not a bad solution. (Tr. 38) Because of these facts the Court finds that it is in the best interests of the child to be placed in the Permanent Custody of MCCS. The Court encourages the foster mother that if she does adopt the child in the future that she continues to promote visitation with his family members, especially his sister."
 {¶ 23} In his first assignment, Rick Saintgnue argues that the trial court erred in failing to appoint an attorney to represent C.S. prior to the hearing before the magistrate in July 2003. C.S.'s counsel raises the same assignment in his brief to this court although C.S. did not appeal the trial court's judgment.
 {¶ 24} MCCS argues that the court was not required to appoint counsel for C.S. because he was represented by a guardian ad litem who represented C.S.'s interests that he not be adopted, but that he be reunified with his mother. MCCS cites R.C.2151.352 and Juv.R. 4(C)(2) for that proposition. MCCS also notes C.S. received counsel before the trial court decided to adopt the magistrate's recommendation, and counsel timely objected to the magistrate's recommendation and filed an extensive memorandum in support of C.S.'s desire that his mother's parental rights not be terminated.
 {¶ 25} In April 2004, the Ohio Supreme Court held that pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(4), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances. In re Williams, 101 Ohio St.3d 398,2004-Ohio-1500.
 {¶ 26} We have reviewed the objections to the magistrate's report filed by C.S.'s counsel on November 24, 2003. Counsel did not object to the magistrate's recommendations for the reason that C.S. did not have counsel at that hearing. Presumably C.S.'s counsel believed the attorney-guardian adequately protected C.S.'s interest at that hearing. Any error in the trial court's failure to appoint C.S. counsel at an earlier stage of the proceeding must be considered waived. The first assignment of error is overruled.
 {¶ 27} In his second assignment of error, Rick Saintgnue argues that the trial court erred in not granting C.S's mother's request for a continuance of the hearing before the magistrate. C.S.'s father argues that the MCCS caseworker and the mother's attorney should have known that C.S's mother was in a nursing home and therefore was unable to participate in the July 14, 2003 hearing before the magistrate.
 {¶ 28} On the day of the hearing, the mother's attorney informed the court that he had no contact with the mother and did not know of her whereabouts. The trial court denied the motion of the mother's attorney for a continuance because the matter had been pending for some time. The father's attorney did not assert at any time that he needed to call the mother as a witness at the hearing. The father has no standing to object to the magistrate's refusal to continue the hearing at the mother's request. The assignment of error is overruled.
 {¶ 29} In his third assignment, Rick Saintgnue argues that he was denied due process and the effective assistance of counsel in the trial court proceedings. He contends that he was not properly notified that counsel had been appointed to represent him until several months after MCCS filed its motion for permanent custody of C.S. He notes that the publication "notice" did not identify him although the mother and MCCS knew he was C.S.'s father and MCCS included him in the case plan. He notes that his name appears on C.S.'s birth certificate. He argues that he did not authorize his lawyer to consent to termination of his parental rights and that MCCS did not make a good faith effort to reunify C.S. with him or his mother. Finally, he argues if there had been any doubt about whether he was C.S's father, the court should have ordered genetic testing when he was present at the October 2002 hearing. He also argues he was considered as an equal participant in the MCCS case plan for reunification with C.S.
 {¶ 30} MCCS argues that C.S.'s father was served by publication notice because certified mail service on him was returned "unclaimed" and regular mail at his last known address was not returned. MCCS argues the publication notice did not name appellant because he had not established paternity and the notice served as notice to all potential fathers. In any event, MCCS notes appellant's attorney represented to the court that he had spoken to appellant and he had no objection to the court proceedings to determine permanent custody at the hearing.
 {¶ 31} MCCS argues that appellant should not prevail on his ineffective assistance of counsel claim because there was no reasonable probability that, but for counsel's ineffectiveness, the result of this proceeding would have been otherwise. MCCS notes that C.S. had been in foster care for over a year and appellant had never visited with the child nor completed the case plan. MCCS notes that MCCS tried to get information from appellant so that a referral for paternity testing could be accomplished but appellant failed to respond to these efforts by MCCS. Lastly, MCCS notes
 {¶ 32} that C.S.'s mother has not seen C.S. for over a year prior to the hearing, had failed to appear for drug assessment and counseling and failed to obtain proper housing for herself and C.S. as provided in the case plan.
 {¶ 33} To meet constitutional due process, a trial court must give some reasonable notice to parties of the setting of the trial date. Ohio Valley Radiology Assoc. Inc. v. Ohio ValleyHosp. Assn. (1986), 28 Ohio St.2d 118. In this case, appellant was served with certified mail notice of the July 2003 hearing and when he did not claim the certified mail, the court sent him notice by regular mail which was not returned to the court. This type of service is adequate service pursuant to Civ.R. 4(D) when service of a complaint is returned unclaimed. Appellant's complaint that he was denied due process is without merit. We also agree with MCCS that appellant has failed to demonstrate that there was a reasonable probability the trial court would not have granted permanent custody to MCCS had his counsel informed the court that he wished to be reunified with his son. There is ample evidence that appellant failed to meet the requirements of the agency's case plan. He did not cooperate in the paternity testing process nor did he offer financial support for C.S. There is also no evidence that appellant made any attempt to visit his son in the year preceding the hearing. (Tr. 17-20). There is also abundant evidence that MCCS made reasonable efforts to reunify C.S. with his parents. The appellant's third assignment of error is also overruled.
 {¶ 34} In his fourth and fifth assignments, Rick Saintgnue contends the trial court's judgment is against the manifest weight of the evidence and is contrary to law. Rick Saintgnue notes that although it was obvious that the child's mother was under the care of a treating physician and mental health provider as late as June 23, 2003, the agency caseworker, Michelle Liu, gave no indication to the court that she had attempted to learn any current information on the mother's treatment. He argues that the agency's routine mailings and referrals do not meet the "clear and convincing" standard for the termination of parental rights. Finally, he argues that the agency should have recommended Planned Permanent Living Arrangement (PPLA) because C.S. wished to maintain a relationship with his mother.
 {¶ 35} MCCS argues that it made reasonable efforts to reunify C.S. with his parents but it is not required to locate transient parents who refuse to maintain contact with the agency. MCCS notes that it attempted to reach the mother at her last known address on many occasions with no avail. MCCS also notes the mother never contacted the GAL who also attempted to contact her as well. MCCS notes the caseworker testified the mother knew what the case plan provided for return of her son to her. MCCS notes that the caseworker testified that appellant was wholly uncooperative in meeting the agency's case plan for him. MCCS notes that there are no relatives of C.S. ready, willing, and suitable to care for him. The agency argues that C.S. deserves to be in a permanent, stable home where he can recapture his lost childhood and mature into a responsible adult. The agency notes that C.S. is fortunate to be in the home of a foster mother who loves him and desires to adopt him. The agency argues that C.S. should not remain in temporary custody indefinitely while he waits to see if one of his parents will demonstrate parental responsibility for him.
 {¶ 36} In order to be placed in PPLA, R.C. 2151.353(5) requires first that PPLA be in the best interests of the child, and second, that the child fits into one of three distinct categories, listed as follows:
 {¶ 37} "R.C. 2151.353(5)(a): The child, because of physical, mental or psychological needs, is unable to function in a family-like setting, and must remain in residential or institutional care.
 {¶ 38} "R.C. 2151.353(5)(b): The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
 {¶ 39} "R.C. 2151.353(5): The child is sixteen years of age or older, has been counseled on the permanent placement options available to the child, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing the child for independent living."
 {¶ 40} It is clear that C.S. is not eligible for PPLA pursuant to R.C. 2151.353 (5)(a) or because there is no evidence he is unable to function in a family-like setting or that he is 16 years of age. There is evidence that his mother has significant drug addiction problems and is unable to care for her child, but the father does not suffer from the same problem. There is evidence that adoption is in the best interest of C.S. and C.S. does not retain a significant relationship with either parent.
 {¶ 41} The evidence does show that C.S. has a significant and positive relationship with his foster mother who wishes to adopt him. C.S. is in need of a legally secure placement and there is substantial evidence to support the trial court's rejection of a PPLA as an alternative to a permanent custody award.
 {¶ 42} It is clear that permanent custody of a child may not be granted unless the trial court finds clear and convincing evidence that one or more of the eight enumerated factors in R.C.2151.141(E) exist. In re William S. (1996), 75 Ohio St.3d 95.
 {¶ 43} There is substantial evidence in this record to support the trial court's finding under R.C. 2151.414(E)(1) that both parents of C.S. failed continuously and repeatedly for six months or more to substantially remedy the conditions causing C.S. to be placed outside his home. There is substantial evidence to support the trial court's finding that appellant has demonstrated a lack of commitment to his son by failing to assist in the establishment of his paternity of the child and to regularly support, visit, and communicate with him. See R.C.2151.141(E)(4). There is substantial evidence to support the trial court's finding that C.S. cannot be placed with either his mother or father within a reasonable time and that permanent commitment to the agency is in the child's best interest. R.C.2151.414(B).
 {¶ 44} It is evident to us that the trial court gave careful consideration to all the statutory requirements for granting permanent custody of this child to MCCS. The fourth and fifth assignments of error are overruled.
 {¶ 45} The judgment of the trial court is Affirmed.
Fain, P.J., and Young, J., concur.